**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **VENITA DIANE JONES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:11-CV-2818-BH |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **ACTING COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the *Order Reassigning Case*, dated September 11, 2012, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed March 9, 2012 (doc. 13), and *Defendant's Motion for Summary Judgment*, filed August 22, 2012 (doc. 16).  Based on the relevant filings, evidence, and applicable law, the plaintiff's motion is **DENIED**, the defendant's motion is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

## I. BACKGROUND[1]

### A.   *Procedural History*

Venita Diane Jones (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability benefits under Title II of the Social Security Act. (R. at 1-3.)  She applied for disability insurance benefits in February 2009, alleging disability beginning September 30, 2008, due to pain in her back, neck, hips, legs, and shoulders, migraines, and vision problems.  (*Id*. at 163.)  Her claims were denied initially and upon

---

[1]  The background comes from the transcript of the administrative proceedings, which is designated as "R."

reconsideration.  (*Id*. at 67-70, 74-76.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and she appeared and testified at a video hearing on September 30, 2010.  (*Id*. at 21, 36, 41-56.)  On October 27, 2010, the ALJ issued a decision finding Plaintiff not disabled.  (*Id*. at 21-30.)  The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (*Id*. at 1-3, 13-14.)  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     ***Factual History***

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born in 1957.  (R. at 41.)  She has some college education and past relevant work experience as a retail salesperson, an information clerk, an adult education instructor, a technical writer, and a computer programmer.  (*Id*. at 42, 57-58.)

    **2.**     **Medical Evidence**

On July 10, 2006, Plaintiff visited MediQuick for pain, redness, swelling, and blurred vision in her left eye.  (*Id*. at 350.)  She reported exposure to chemicals while wearing soft contact lenses.  Her diagnosis was corneal abrasion, and she received a prescription for Vigamox.  (*Id*. at 351, 353.)  She visited MediQuick again the next day for pain, swelling, and decreased and blurred vision in her left eye.  (*Id*. at 347.)  She reported an injury, e.g., exposure to pesticides.  She was diagnosed with a corneal abrasion and chemical conjunctivitis.  (*Id*. at 348.)  The treating doctor conferred with Dr. Michael K. Makoski of Tomoka Eye Associates; he indicated a need for follow-up.  (*Id*. at 311, 348.)  On August 15, 2006, Dr. Mark E. Kennedy–also with Tomoka Eye Associates referred her to Dr. Subir S. Bhatia, an opthamologist with the Shands Clinic at the University of Florida.  (*Id*. at 253-55.)  He also ordered orbital and brain CTs.  (*Id*. at 308-310.)

Plaintiff saw Dr. Bhatia on August 21, 2006.  (*Id*. at 254.)   Upon exam, her best corrected vision was 20/25 in her right eye, and 20/400 in her left eye.  (*Id*.)  Her left pupil was round with posterior synechiae, and her left eyelid was swollen, with eyrthema and ptosis.  (*Id*.)  Her left eye had signification injection and chemosis of the conjunctiva, and deep dilated scheral vessels.  (*Id*.) Her left cornea had superocentral opacification with undefined borders with keratitic precipitates and Descemet's membrane folds.  (*Id*.)  Dr. Bhatia noted synechiae and trace anterior uveitis.  (*Id*.) He performed Hertel's exophthalmometry, and it showed no proptosis in the left eye.  (*Id*.)  A B-scan of Plaintiff's left eye revealed serous retinal detachment in the periphery.  (*Id*.)  Her motilities were limited and upgazed in the left eye.  (*Id*.)  An orbital CT with and without contrast revealed abnormal soft tissue swelling involving the preseptal soft tissue, consistent with preseptal cellulitis. (*Id*. at 254, 263-64.)  A CAT scan showed a tiny choroidal detachment anteriorly.  (*Id*. at 254.)  Her lacrimal gland was also swollen.  (*Id*. at 254.)  Dr. Bhatia noted alternative diagnoses of scleritis and orbital cellulitis.  He prescribed Levaquin. Vigamox, and Pred Forte.  (*Id*. at 255.)

On September 6, 2006, Plaintiff underwent another ocular CT.  (*Id*. at 257.)  The report described a slight deformity of the optic globe of the left eye in the same location as the prior CT and tissue edema surrounding the globe in tenon's space and along the muscle insertion sites.  (*Id*.) It also noted lessened myositis and lacrimal inflamation.  (*Id*.)  The diagnostic impression was improving episcleritis.  (*Id*. at 258.)

Plaintiff saw Dr. Mark Kennedy to follow-up on her scleritis and corneal ulcer on January 3, 2007.  (*Id*. at 322.)  She reported that she had seen a specialist, and that her eye had been irritated lately.  (*Id*.)  He reduced her dosage of Pred Forte.  (*Id*.)

On January 16, 2007, Plaintiff saw Dr. Don J. Alfonso at Ardent Family Care.  (*Id*. at 429.)

Dr. Alfonso diagnosed chronic back pain, migraines and anxiety.  (*Id*. at 430.)  He prescribed Percocet, Xanax and Axert.  (*Id*.)  Plaintiff returned to him on March 14, 2007, complaining of headaches, shoulder pain, and nervousness.  (*Id*. at 427.)  He diagnosed her with migraine headaches and prescribed Percocet and Valium.  (*Id*. at 428.)

On April 3, 2007, Plaintiff was treated at the Florida Hospital - Flagler (FH) emergency room for left shoulder and neck pain due to an automobile accident.  (*Id*. at 266, 268.)  She reported sharp pain, moderate in severity.  (*Id*. at 266.)  She also had pain and numbness in her left arm with decreased range of motion.  (*Id*. at 266, 270.)  A cervical spine CT report revealed degenerative disc disease at multiple levels, but no cord compression or fracture.  (*Id*. at 269-71.)  There was foraminal stenosis on the right at C4-5 (mild) and C5-6 (moderate).  (*Id*. at 269.)  The report also revealed a diffuse disc bulge and midline disc/osteophyte complex at C6-7 with bilateral foraminal stenosis.  (*Id*.)  The anterior CSF space was obliterated at C7, and there was a diffuse disc bulge with mild foraminal stenosis at C7-T1.  (*Id*.)

After an automobile accident, Plaintiff saw Dr. Alfonso on April 10, 2007, for bilateral pain in her arms and hands, pain in her neck, low back and shoulder, and headaches.  (*Id*. at 425.)  He noted that she had tenderness in her left shoulder and lumbrosacral regions.  (*Id*. at 426.)  He diagnosed neck, shoulder and low back pain, and migraines, and prescribed Percocet and Valium. (*Id*.)  Plaintiff returned on April 25, 2007, for chronic neck and back pain.  (*Id*. at 423.)  She said that she had tried to return to work on light duty, but could not tolerate it.  (*Id*.)  Dr. Alfonso instructed her to refrain from work for three weeks, and prescribed Percocet, Valium, and Xanax.  (*Id*. at 424.)

Plaintiff was treated at FH's emergency room on May 2, 2007, for pain in her neck, right shoulder and lower back after a second automobile accident.  (*Id*. at 275-76.)

On May 23, 2007, Plaintiff saw Dr. Alfonso for low back pain following a car accident. (*Id*. at 421.) Her neurological exam was normal. (*Id*. at 422.) He diagnosed low back and neck pain, prescribed Percocet, and referred her to physical therapy. (*Id*.) Plaintiff attended physical therapy between May and August 2007. (*Id*. at 464.) She returned to Dr. Alfonso for neck and right shoulder pain on June 15, 2007, and she also complained that her neck pain caused headaches. (*Id*. at 419.) Her neurological exam was again normal. (*Id*. at 420.) He diagnosed neck and low back pain and migraine headache. (*Id*.) Dr. Alfonso discontinued Xanax, prescribed Valium and Percocet, and instructed her to take Naproxen and to refrain from physical therapy for a week. (*Id*.)

Plaintiff saw Dr. Kennedy about her broken glasses on July 3, 2007. (*Id*. At 318.) He noted that her left eye was red. (*Id*.) He provided her with her prescription for eye glasses and referred her to a corneal specialist for an evaluation. (*Id*.)

On July 6, 2007, Plaintiff saw Dr. Alfonso for neck pain, cervical disc disease, and migraines. (*Id*. at 417-18.) She stated that her neck pain had improved and requested more physical therapy. (*Id*. at 417.) Her neurological exam was normal. (*Id*. at 418.) He diagnosed neck pain, cervical disc disease, and headaches, and he instructed her to continue with therapy. (*Id*.)

Plaintiff saw Dr. Miguel Lugo on July 13, 2007, for poor vision in her left eye. (*Id*. at 290.) Her vision with glasses was 20/300 in the left eye. (*Id*.) A slit-lamp exam revealed significant scarring on the top half of her cornea, extending onto the pupillary axis. (*Id*.) The stroma was scarred at different levels, sometimes approaching Descemet's. (*Id*.) Dr. Lugo noted an area of about 40% thickness loss of the stroma and superior "ghost" vessels. (*Id*.) He recommended a cornea transplant. (*Id*.)

Plaintiff returned to Dr. Alfonso for neck, low back, and right shoulder pain on July 20,

2007.  (*Id.* at 416.)  She had improved range of motion in her left arm.  (*Id.* at 415.)  He prescribed Percocet and Valium and instructed her to continue with physical therapy.  (*Id.*)  He saw her again on August 9, 2007, for complaints of right shoulder and bilateral hip pain.  (*Id.* at 413-14.)  Her neurological exam was normal.  (*Id.* at 414.)  He continued her medications.  (*Id.*)

Dr. Miguel Lugo performed cornea transplant surgery on Plaintiff's left eye due to corneal scarring on August 29, 2007.  (*Id.* at 278-80.)  Plaintiff returned for follow-up after her surgery on September 6, 2007, October 24, 2007 and November 9, 2007.  (*Id.* at 288.)

On September 13, 2007, Plaintiff saw Dr. Alfonso for shoulder and bilateral hip pain.  (*Id.* at 411.)  She had decreased range of motion in her right shoulder, but reported that her hip pain had improved.  (*Id.*)  Dr. Alfonso continued her medications and instructed her to continue with physical therapy.  She returned on October 12, 2007, with complaints of neck, right shoulder, and low back pain.  (*Id.* at 409-10.)  She reported that her low back pain was better, and that her neck and shoulder felt slightly better.  (*Id.*)  She had decreased range of motion in her right shoulder.  (*Id.* At 409.)  He continued her medications.  (*Id.* at 410.)  Dr. Alfonso saw Plaintiff again on November 13, 2007, for shoulder and low back pain after a car accident.  (*Id.* at 407.)  He prescribed Axert.  (*Id.* at 408.)  She returned on December 13, 2007, for headaches, and shoulder, neck, and back pain.  (*Id.* at 405-06.)  He gave her prescriptions for Percocet and Valium.  (*Id.*)  At each of these four visits, her neurological exam was normal.  (*Id.* at 406, 408, 410, 412.)

Plaintiff saw Dr. Lugo for a follow-up appointment on December 14, 2007.  (*Id.* at 285.)  Her old glasses caused eye strain, and she complained of occasional foreign body sensation in her cornea.  (*Id.*)  Dr. Lugo removed a few filaments.  (*Id.*)  Her uncorrected distance vision in the left eye was 20/50, and her intraocular pressure was 16.  (*Id.*)  A slit-lamp exam showed a clear, compact

6

graft with mild astigmatism. (*Id*.) He also noted posterior synechiae on the lower pupil, with an early nuclear sclerosis of the lens–remnants of the original inflammation. (*Id*.) Dr. Lugo recommended that Plaintiff continue to take topical steroids for at least a year. (*Id*.)

On December 18, 2007, Plaintiff saw Dr. Kennedy to obtain a prescription for new glasses. (*Id*. at 316.)

Plaintiff returned to Dr. Alfonso on January 15, 2008, with complaints of neck and shoulder pain. (*Id*. at 401.) She reported that her pain was worse in cold weather. (*Id*.) Her neurological exam was normal. (*Id*. at 402.) Dr. Alfonso diagnosed neck, shoulder and low back pain, and headaches. (*Id*.) He prescribed Percocet, Valium, and Axert. (*Id*.) He saw her again on February 13, 2008, for the same complaints. (*Id*. at 399.) Her neurological exam was again normal, and Dr. Alfonso's diagnosis remained the same. (*Id*. at 400.) This time, he prescribed Keflex, Percocet and Valium, and instructed Plaintiff to continue with home physical therapy. (*Id*.) On March 2, 2008, Plaintiff returned due to continued headaches and neck pain, contending that she was not feeling any better. (*Id*. at 397.) Her neurological exam was normal. (*Id*. at 398.) Dr. Alfonso diagnosed shoulder and neck pain, and headaches, and he prescribed Percocet and Valium. (*Id*.)

On April 11, 2008, Plaintiff again complained to Dr. Alfonso of neck and shoulder pain and headaches, and stated that her condition had not improved much. (*Id*. at 395-96.) He diagnosed neck and shoulder pain, and headaches, prescribed Valium and Percocet, and instructed her to continue with home physical therapy. (*Id*.) Dr. Alfonso saw Plaintiff on May 12, 2008, for neck, back, and shoulder pain, and she reported that her back pain had gotten worse. (*Id*. at 393.) Dr. Alfonso's diagnosis remained as neck and shoulder pain, and headaches, and he prescribed Valium and Percocet. (*Id*.) Plaintiff returned on June 14, 2008, for neck, back, and shoulder pain, and

7

migraine headaches.  (*Id*. at 391.)  He diagnosed neck, shoulder, and low back pain, and headaches, and he prescribed Valium, Percocet and Axert.  (*Id*.)  At each of these visits, her neurological exam was normal.  (*Id*. at 392, 394, 396.)

Plaintiff visited Ardent Family Care with complaints of neck, shoulder, and back pain, and numbness in her arms on July 10, 2008.  (*Id*. at 387, 390.)  She reported that lying down and stretching her back improved her pain, but that sitting, standing, and sleeping in one position for too long made her pain worse.  (*Id*. at 390.)  She was given refills of her medications.  (*Id*. at 388.)

On August 11, 2008, Plaintiff returned to Dr. Alfonso with complaints of neck, back, and shoulder pain, and migraine headaches.  (*Id*. at 385.)  She had decreased range of motion in her right shoulder.  (*Id*.)  He diagnosed cervical disc disease, lumbar disc disease and right shoulder pain.  (*Id*. at 386.)  He referred her for an orthopedic evaluation, ordered an MRI of her right shoulder, and prescribed Percocet and Valium.  (*Id*. at 386.)  He saw her again on September 11, 2008, for headaches, neck and back pain.  (*Id*. at 383.)  She described her neck pain as the worst and explained that she had numbness in her neck and hands.  (*Id*.)  She also reported that her migraines were worse.  (*Id*.)  Her neurological exam was normal.  (*Id*. at 384.)  Dr. Alfonso diagnosed migraines, and cervical disc disease with radiculopathy, and he prescribed Percocet and Valium.  (*Id*.)

Plaintiff saw Dr. Kennedy on September 30, 2008, for decreased visual acuity over a period of 2-3 months.  (*Id*. at 314.)

On October 2, 2008, Plaintiff saw Dr. Allan A. Girouard, an orthopedic surgeon.  (*Id*. at 464, 475.)  She complained of neck, back, and shoulder pain, and degenerative disc disease.  (*Id*.)  She also complained of numbness in her arms and pain that radiated into her legs.  (*Id*.)  She stated that her pain was worse when she stood, walked, ran, twisted, and during and after exercise.  (*Id*. at 464.)

8

It was relieved by lying down, and by pain pills and muscle relaxants. (*Id*.) She listed her medications as Percocet, Valium, Axert, and ibuprofen. (*Id*. at 466.) He diagnosed her condition as cervicalgia with brachialgia with objective radiculopath, ordered a cervical MRI and prescribed medication. (*Id*. at 475.)

Dr. Alfonso examined Plaintiff on October 9, 2008, for back, shoulder, and neck pain. (*Id*. at 381.) Her neurological exam was normal. (*Id*. at 382.) He diagnosed shoulder and neck pain, headaches, and lumbar disc disease, and he prescribed Valium and Percocet. (*Id*.)

Plaintiff underwent x-rays and an MRI of her cervical spine on October 21, 2008. (*Id*.at 293-95.) The x-ray report showed mild uncovertebral joint spurring at C5-C6, and minimal anterior osteophyte formation at C5-C6. (*Id*. at 293.) The diagnostic impression was minimal bony degenerative changes of the cervical spine. (*Id*.) The MRI report revealed multilevel degenerative disease in the cervical spine. (*Id*. at 294-95.) At C5-C6, there was broad-based disc osteophyte complex with a superimposed right lateral disc protrusion or uncovertebral joint spur that resulted in right neural foraminal narrowing. (*Id*. at 294.) There were also broad-based disc osteophyte complexes at C4-C5 and C6-C7, and mild central canal narrowing at C4-C5. (*Id*. at 295.)

Plaintiff returned to Dr. Alfonso for shoulder and lumbar disc pain, and headaches on November 13, 2008. (*Id*. at 379.) Her neurological exam was normal. (*Id*. at 380.) Her diagnosis remained as neck and shoulder pain, and headaches, and he prescribed Valium, Axert and Percocet. (*Id*.) On November 18, 2008, at her request, he provided her with a release for work as of November 19, 2008. (*Id*. at 540-41.)

Plaintiff underwent a lumbar spine MRI on November 24, 2008. (*Id*. at 292.) The MRI report revealed  a mild left lateral bulge with mild narrowing of the left neural foramina at L4-L5.

(*Id.*)  There was mild bilateral facet arthritis at L4-5 and L5-S1.  (*Id.*)

On December 15, 2008, Plaintiff returned to Dr. Alfonso with complaints of continued back and neck pain.  (*Id.* at 374.)  He diagnosed her with neck pain, headaches, and chronic low back pain, and he prescribed Valium and Percocet.  (*Id.*)  She returned on January 13, 2009, for chronic cervical disc disorder and chronic shoulder pain.  (*Id.* at 373.)  He diagnosed her with chronic cervical disk disease and chronic shoulder pain, prescribed Valium and Percocet, and completed a return to work form for her effective January 15, 2009.  (*Id.* at 371, 373-74.)  Dr. Alfonso saw her on February 12, 2009, for neck and back pain accompanied by numbness, and headaches.  (*Id.* at 369-70.)  He diagnosed neck and shoulder pain, and headaches, and prescribed Valium and Percocet.  (*Id.* at 370.)  For each visit, her neurological exam was normal.  (*Id.* at 370, 373, 375.)

Plaintiff went to Dr. Kennedy on March 6, 2009, for light sensitivity.  (*Id.* at 312.)  He gave her samples of preservative-free tears.  (*Id.*)

Plaintiff saw Dr. Girouard for complaints of neck pain that radiated into her shoulders on March 19, 2009.  (*Id.* at 469.)  He noted that she had no "constitutional symptoms" and no "myelopathic symptoms."  (*Id.*)  Her other joints were intact with no signs of dislocation, subluxation or laxity.  (*Id.*)  There was no muscle atrophy or weakness.  (*Id.*)  Plaintiff stated that her pain limited her daily living activities, but she elected to put off surgery for as long as possible.  (*Id.*)  He instructed her to follow up with x-rays in 6 months.  (*Id.*)

On March 27, 2009, Plaintiff returned to Dr. Alfonso for back, neck, and shoulder problems.  (*Id.* at 528.)  He prescribed Valium and Percocet.  (*Id.* at 529.)  He saw her again on May 8, 2009.  (*Id.* at 504.)  Her  neurological exam was normal.  (*Id.* at 505.)  He diagnosed chronic neck and shoulder pain and refilled her prescriptions for Valium and Percocet.  (*Id.*)

On May 13, 2009, Plaintiff saw Dr. Alvan Barber for a consultative examination. (*Id.* at 482-489.)  She complained of back, neck, hip, leg, and shoulder problems, vision problems, and migraines. (*Id.* at 482.)  Her symptoms included back, neck, and leg pain, decreased range of motion, difficulty with standing, sitting and utilizing the computer. (*Id.*)  Plaintiff also reported weekly migraines caused by her back and neck pain. (*Id.*)  She had a cornea transplant in 2007 and was under the care of an eye specialist due to a retinal problem with her left eye. (*Id.*)  She listed her medications as pain pills, muscle relaxants, and Axert. (*Id.*)  She used sterile eye drops and cream for her eye. (*Id.*)  Plaintiff stated that she could walk, stand, and sit for 45 minutes, lift 10-15 pounds, and drive short distances. (*Id.*)

Dr. Barber noted that Plaintiff was ambulatory, cooperative, and communicated well. (*Id.* at 484.)  Her visual acuity with glasses was 20/40 in her right eye, 20/80 in her left eye, and 20/30 for both eyes. (*Id.*)  She had full muscle and grip strength in her arms and negative Tinnel and Phelan's signs. (*Id.* at 485.)   On straight leg raise tests, Dr. Barber noted that Plaintiff experienced right low back pain at 60 degrees, and left low back pain at 70 degrees. (*Id.*)  She had full strength in her legs, but exhibited mid/low paravertebral muscle spasms and tenderness in her right and left sacroiliac joints. (*Id.*)  Plaintiff walked without difficulty and could heel and toe walk but could not squat. (*Id.* at 486.)  Her range of motion was mildly decreased in her knees, shoulders, and neck, and she could forward flex to 70 degrees. (*Id.* at 487-88.)  Her neurological exam was normal. (*Id.* at 486.)   Dr. Barber diagnosed Plaintiff with cervical and lumbar degenerative disc disease with pain, migraine headache disorder, left corneal and retinal pathology, and status post left corneal transplant with decreased left vision. (*Id.* )  He opined that Plaintiff had the functional ability to walk, stand and sit for reasonable periods of time; lift and carry at least 10 pounds frequently, and

11

20 pounds occasionally; use upper body movements and engage in coordinated activities with her hands.  (*Id*.)  He did not state whether he had Plaintiff's relevant medical records at the time of his exam and/or report.  (*Id*. at 482-89.)

State agency medical consultant (SAMC) Dr. William Williford completed a physical residual functional capacity assessment of Plaintiff on May 20, 2009.  (*Id*. at 491-98.)  He noted her diagnosis as degenerative disc disease.  (*Id*. at 491.)  He opined that she had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight; climb ramps and stairs, balance, stoop, kneel, crouch and crawl occasionally; never climb ladders, ropes and scaffolds.  (*Id*. at 492-93.)  He found no manipulative, visual, or communicative limitations.  (*Id*. at 494-95.)  He found that Plaintiff should avoid concentrated exposure to extreme heat and cold, and hazards such as machinery and heights.  (*Id*. at 495.)  He concluded that Plaintiff's symptoms were attributable to a medically determinable impairment, but that their severity and effect on her daily living activities exceeded what he expected based on objective findings and clinical evidence.  (*Id*. at 496.)  Finally, he noted that he had considered her pain and its effect on her functioning in arriving at her RFC.  (*Id*.)  He cited to Dr. Barber's consultative examination in his report; he did not indicate whether he had Plaintiff's complete record.  (*Id*. at 491-97.)

On June 4, 2009, Plaintiff saw Dr. Alfonso with complaints of migraine headaches and back pain.  (*Id*. at 502.)  Her neurological exam was normal.  (*Id*. at 503.)  He diagnosed cervical disc disorder, lumbar degenerative disc disease, and migraine headaches.  (*Id*.)  He prescribed Valium and Percocet, and referred Plaintiff to an orthopedic specialist for evaluation.  (*Id*.)  Dr. Alfonso saw Plaintiff again on July 6, 2009, for neck and back pain and migraine headaches.  (*Id*. at 500.)  Her

neurological exam was normal.  (*Id.* at 501.)   He diagnosed cervical disc disorder, lumbar degenerative disc disease, and migraine headaches and prescribed Valium and Percocet.  (*Id.*)  Plaintiff returned on August 19, 2009, complaining of headaches, and back and shoulder pain.  (*Id.* at 520.)  Her neurological exam was normal again, and he diagnosed chronic cervical disc disorder, lumbar degenerative disc disease, and migraine headaches and prescribed Valium and Percocet.  (*Id.* at 521.)  On September 10, 2009, Plaintiff saw Dr. Alfonso with complaints of neck and back pain, and arthritis.  (*Id.* at 518.)   He diagnosed chronic cervical degenerative disc disease and again prescribed Valium and Percocet.  (*Id.* at 519.)

On October 3, 2009, SAMC Dr. Marc Tafflin completed a physical RFC assessment on Plaintiff.  (*Id.* at 506-13.)  He listed her diagnoses as degenerative disc disease and status post left corneal transplant.  (*Id.* at 506.)  He opined that she had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight; climb ramps and stairs, balance, stoop, kneel, crouch and crawl occasionally; never climb ladders, ropes and scaffolds; and reach overhead with her right upper extremity occasionally to frequently.  (*Id.* at 509.)  He found no communicative limitations and offered no opinion concerning any visual limitations.  (*Id.* at 509-10.)  He opined that Plaintiff should avoid concentrated exposure to vibration and hazards such as machinery and heights.  (*Id.* at 510.)  He concluded that Plaintiff's symptoms were attributable to a medically determinable impairment, but that she was only partially credible in that the severity of her symptoms was disproportionate to what he expected.  (*Id.* at 511.)  He relied on Dr. Barber's report, and x-ray and MRI reports, but did not state whether he had Plaintiff's complete medical record.  (*Id.* at 506-13.)

Plaintiff returned to Dr. Alfonso for complaints of degenerative disc disease and migraine

13

headaches on October 4, 2009. (*Id*. at 516.) Her neurological exam was normal. (*Id*. at 517.) He discontinued Percocet and prescribed Lortab instead. (*Id*.) He saw her again on October 28, 2009, for complaints of degenerative disc disease. (*Id*. at 514.) Plaintiff reported that she still had migraines, and that neither physical therapy nor chiropractic treatment helped. (*Id*.) Dr. Alfonso diagnosed chronic cervical degenerative disc disease and migraine headaches, and he continued her medications. (*Id*. at 515.)

On November 4, 2009, Dr. Alfonso completed a multiple impairment questionnaire for Plaintiff. (*Id*. at 552-559.) He noted that he had treated her since March 2000, and that her most recent visit was October 28, 2009. (*Id*. at 552.) He diagnosed multilevel cervical disc disease at C5-C6 with broad based disc osteophyte complex with right-sided radiculopathy, and lumbar disc bulge at L4-L5 with bilateral facet arthritis at L4-L5 and L5-S1. (*Id*. at 552.) He reported clinical findings of neck pain with headache and migraines, upper back numbness and tingling radiating to the right arm, and low back pain with radiculopathy to both legs. (*Id*.) He cited cervical and lumbar MRIs in support of his diagnoses. (*Id*. at 553.) He noted Plaintiff's primary symptoms as neck pain radiating to her back and hips, and difficulty standing more than 30 minutes due to pain in both legs. (*Id*.) He also noted she had limited vision in her left eye due to corneal problems and complications that resulted in permanent retinal damage. (*Id*.) Plaintiff's neck pain was constant and aggravated by working on a computer for more than 30 minutes; her arms became numb if she sat in one position for more than 30 minutes. (*Id*.) She had pain daily, and her pain was worse with prolonged standing and stress, which aggravated her headaches, neck and upper back pain. (*Id*. at 554.) Dr. Alfonso rated Plaintiff's pain as 8 on a scale of 1-10, and her fatigue as 7-8/10. (*Id*.) He noted that medication had not completely relieved her pain without unacceptable side effects. (*Id*.)

14

Dr. Alfonso also opined that she had the following physical RFC: lift and carry up to 10 pounds occasionally; stand, walk, and sit for less than 1 hour in an 8-hour workday; never push, pull, bend or stoop; and avoid temperature extremes, humidity, dust, and hazards such as heights.  (*Id*. at 554, 558.)  He opined that she should alternate sitting with standing and walking every 30-45 minutes.  (*Id*. at 554-55.)  He also opined that Plaintiff had psychological limitations and limited vision which affected her ability to work at a regular job on a sustained basis.  (*Id*. at 558.)  He opined that Plaintiff was markedly limited in her ability to use her arms for reaching overhead, was minimally limited in her ability to use her fingers and hands for fine manipulations, and had no limitations in her ability to grasp, turn and twist objections.  (*Id*. at 555-56.)  He listed no medications, but noted that he had made efforts to substitute medications to reduce symptomatology and side effects.  (*Id*. at 556.)

He noted that Plaintiff was unable to tolerate steroid treatments, and that he had prescribed benzodiazepines to reduce stress and muscle spasms.  (*Id*. at 556.)  He further noted that an orthopedic specialist had recommended cervical spine surgery, but that Plaintiff had elected against it.  (*Id*.)  He opined that Plaintiff's symptoms would worsen in a competitive work environment. (*Id*.)  He further opined that her condition interfered with her ability to keep her neck in a constant position, and that she could not work full-time in a job that required her to do so on a sustained basis.  (*Id*. at 556-57.)  Dr. Alonso also opined that Plaintiff's pain, fatigue, and other symptoms would interfere frequently with attention and concentration.  (*Id*. at 557.)  He opined that her impairments were ongoing and had continued for 2 years.  (*Id*. at 557-58.)  He further opined that Plaintiff had frustration and anxiety that contributed to the severity of her symptoms and limitations, and that she was incapable of tolerating even "low stress."  (*Id*. at 557.)  He opined that she would

need to take unscheduled breaks as often as every 30 minutes, and to rest at least 10-15 minutes before returning to work. (*Id.*) He also opined that Plaintiff was likely to miss work more than 3 times each month due to her impairment or treatment. (*Id.* at 558.)

On November 20, 2009, Dr. Alfonso saw Plaintiff for her chronic neck and back pain. (*Id.* at 560-61.) Her neurological exam was normal. (*Id.* at 561.) He diagnosed chronic neck and back pain, and he prescribed Valium and Lortab. (*Id.*) He saw her again on January 22, 2010, for migraine headaches, and neck and back pain. (*Id.* at 568.) She reported no improvement in her condition. (*Id.*) Her neurological exam was normal. (*Id.* at 569.) Dr. Alfonso diagnosed Plaintiff with migraines and chronic back pain, and prescribed her Valium and Lortab. (*Id.*) Plaintiff returned on February 20, 2010, with complaints of pain, muscle spasms, and migraines. (*Id.* at 241.) He prescribed Valium and Lortab. (*Id.* at 241-42.)

On December 27, 2010, Dr. Alfonso submitted a narrative report concerning Plaintiff. (*Id.* at 571.) He noted that she had been his patient since March 2000, and that she suffered recurrent neck, back, and shoulder pain, and migraine headaches after a car accident in April 2007. (*Id.*) He noted that he had treated her regularly, and that his physical examinations revealed neck pain that triggered chronic migraine headaches, joint and muscle pain that radiated to the hips, upper back numbness and tingling that radiated to her right arm, and low back pain with radiculopathy to both legs. (*Id.*) He also noted symptoms of depression, frustration, anxiety, and insomnia. (*Id.*) Plaintiff saw an orthopedist and a chiropractor, but it did not help. (*Id.*) He reiterated his prior opinion of Plaintiff's RFC, and explained that although he had previously issued work releases for her, he viewed her prognosis as poor based on her failure to respond to consistent monthly treatments and efforts to relieve her symptoms with Valium, Percocet, and Keflex. (*Id.*) He concluded that Plaintiff

16

was not able to work on a full-time, competitive basis.  (*Id*.)

### 3.      Hearing Testimony

On September 30, 2010, Plaintiff and a vocational expert testified at a video hearing before the ALJ.  (*Id*. at 36-64.)  Plaintiff was represented by an attorney at the hearing.  (*Id*. at 36.)

#### a.      *Plaintiff's Testimony*

Plaintiff was born March 24, 1957; she was 53 years old at the time of the hearing.  (*Id*. at 41.)  She was separated from her husband, and lived with her brother and her 8-year-old son.  (*Id*.)  She attended college and technical school.  (*Id*. at 42.)  She was 5' tall and 140 pounds.  (*Id*.)

Plaintiff had worked as a technical writer on and off and was self-employed as a vocational computer instructor.  (*Id*. at 58-59.)  She wrote her own material for her classes and sold the manuals through her business.  (*Id*.)  She had not done much technical writing in the past 15 years.  (*Id*. at 58.)  She worked at U-Save Auto and Car Rentals between January and April 2007.  (*Id*. at 56-57.)  The job required her to drive most of the day, and she could not do that after she was injured in car accidents in April and May 2007.  (*Id*. at 57.)  Plaintiff last worked in January 2009 as a part-time retail salesperson.  (*Id*. at 42.)  She held that job for around a year and stopped working because she had trouble standing due to pain.  (*Id*. at 42-43.)  When she started the job, her employer was aware of her limitations.  (*Id*. at 43.)  Her responsibilities changed later, and she was required to lift 25 or more pounds and run a heavy vacuum sweeper.  (*Id*.)  Her breaks were cut back, and she could not stay on her feet and walk around enough to help customers.  (*Id*.)  She went home in pain at the end of each shift, even if she took pain medication.  (*Id*.)  Her employer cut her hours back over time, and eventually laid her off.  (*Id*.)

Plaintiff testified that she was unable to work because she could not sit or stand for more than

15-20 minutes, and she could not walk more than a block without pain.  (*Id*. at 44, 47.)  She had  low

back pain when she sat, and she could not get comfortable.  (*Id*. at 47.)  When she sat too long, her

legs went numb.  (*Id*.)  Walking made her neck and low back pain worse.  (*Id*.)  She did not use a

cane or a walker.  (*Id*. at 51.)  She was in constant pain, but it varied from day to day.  (*Id*. at 44.)

At the time of the hearing, her worst pain was in her low back and radiated into her left leg.  (*Id*.)

At other times, her neck and upper back tightened up and hurt, which triggered a migraine.  (*Id*.)

Her migraines varied in frequency from every few days to once a month.  (*Id*. at 44-45.)  She

described her back pain (with no medication) as 8 on a scale from 1-10; her neck pain was 7-8/10.

(*Id*. at 45.)  She no longer took pain medication because she could not afford it.  (*Id*.)

Plaintiff had trouble reaching overhead because it aggravated her neck and shoulders.  (*Id*.

at 48-49.)  Her neck pain worsened when she turned her head too quickly, or if she tried to look over

her shoulder.  (*Id*. at 53.)  She was uncomfortable driving in traffic because she could not turn her

head, and she had limited vision in her left eye.  (*Id*. at 44.)  Her vision in that eye was milky and

hazy, and she just saw shadows.  (*Id*. at 51.)  Reading or looking at a computer screen aggravated

her eyes.  (*Id*. at 51-52.)  She could not read or look at a computer screen for more than 15-20

minutes, and she had to rest 2-3 hours between computer sessions.  (*Id*. at 52, 60.)  She was sensitive

to light and wore big glasses for shading.  (*Id*. at 52-53.)

Plaintiff got her son ready for school and drove him there.  (*Id*. at 46.)  After returning home,

she used the computer and watched TV or talked to her pets.  (*Id*.)  She ate lunch  and did dishes.

(*Id*.)  She did a little light vacuuming and sweeping, but she could only sweep one room at a time.

(*Id*. at 49.)  She rested from 1-3 in the afternoon, and then picked her son up from school.  (*Id*. at 46.)

In the evenings, she helped her son with homework and read books with him.  (*Id*.)  She volunteered

at her son's school for a few hours a week, but only performed tasks that allowed her to move around and did not require her to stand for long periods.  (*Id*. at 46, 54.)  She took him to the pool every few weeks in the summer, but she could not sit there long.  (*Id*. at 46.)

Plaintiff did no lawn work or gardening.  (*Id*. at 49.)  She spread chores like laundry throughout the week to avoid aggravating her back and neck.  (*Id*. at 46.)  She shopped, but she avoided big stores and took her son with her to carry things.  (*Id*. 49-50.)  It took her all day to accomplish what she used to do in only two hours.  (*Id*. at 45-46.)  She went to bed at 11 and got up at 7, but she slept only 4-5 hours a night because pain interfered with her sleep.  (*Id*. at 48.)  She slept better with muscle relaxers and pain pills.  (*Id*.)  During the day, she rested in a recliner because it was more comfortable.  (*Id*.)  She moved around a lot because if she sat too long, it made her pain worse, and she had numbness.  (*Id*. at 46-47.)

Plaintiff testified that she had three choices in treating her condition: to continue as she was, to have steroid shots, or to have surgery.  (*Id*. at 55.)  She could not do steroid shots.  (*Id*.)  If she had neck surgery, she would need back surgery, too.  (*Id*.)  Her doctor advised her that surgery would help with her pain, but it would not affect her ability to work.  (*Id*. at 55-56.)  She was concerned about the cost of surgery and possible complications, so she decided to postpone surgery since she was functioning on pain medication.  (*Id*. at 55.)  Her last doctor visit was in February 2010, before moving to Texas.  (*Id*. 53.)

### b.   *VE Testimony*

Todd M. Harden, a vocational expert (VE), also testified at the hearing.  (*Id*. at 36, 56-62, 119.)  He testified that Plaintiff's past relevant work included retail sales (light, SVP 3); information clerk (sedentary, SVP 4, DOT 237.367-022); vocational teacher (light, SVP 7); technical writer

19

(sedentary, SVP 8); and specialty computer programmer (sedentary, SVP 7).  (*Id*. at 57-58, 62.)

The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work as actually performed or customarily performed in the national economy with the following limitations:  lift and carry 20 pounds occasionally; 10 pounds frequently; stand and walk 6 out of 8 hours; sit 6 of 8 hours with the ability to alternate sitting or standing as needed to relieve pain or discomfort; push or pull 20 pounds occasionally; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, kneel, crouch, stoop; never balance, crawl or reach overhead; frequently reach, handle, finger, and feel bilaterally; only look at computer screens for 30 minutes at a time; and never work in close proximity to hazardous moving machinery or in unprotected space.  (*Id*. at 59-60.) The VE opined that the hypothetical person could perform Plaintiff's past relevant work as an information clerk as described in the DOT, but not as performed.  (*Id*. at 60.)

The ALJ also asked the VE to opine whether there were jobs that existed in the national economy that a hypothetical person with the same limitations, and who had transferable skills, could perform.  (*Id*. at 60.)  The VE explained that Plaintiff's sales and customer service skills were transferable, and he identified jobs as a motel clerk (light, SVP 4) with 100,000 jobs in the national economy and 10,000 in Texas; auto self-service attendant (light, SVP 3) with 50,000 jobs in the national economy and 4,000 in Texas; and check cashier (sedentary, SVP 3) with 50,000 jobs in the national economy and 4,000 in Texas.  (*Id*. at 61.)  He took Plaintiff's need for a sit/stand option into account by reducing the number of available jobs, particularly that of motel clerk.  (*Id*.)

Plaintiff's counsel asked the VE to clarify  whether the transferable skills he identified would be utilized in the same industry or field as the hypothetical person's prior jobs; he responded

that they would be in different industries.  (*Id*. at 62.)  Plaintiff's counsel asked the VE to opine

whether a hypothetical person could perform Plaintiff's past relevant work if she had the following

limitations:  lift and carry 10 pounds occasionally; stand and walk 1 out of 8 hours; sit 1 of 8 hours;

never reach overhead; and incapable of "intolerating low stress [sic]."  (*Id*.)  The VE opined that the

hypothetical person could not perform Plaintiff's past relevant work or any other kind of work.  (*Id*.)

### C.    *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on October 27,

2010.  (*Id*. at 21-30.)  At step 1, the ALJ found that Plaintiff was fully insured for disability under

Title II through December 31, 2012.  (*Id*. at 23.)  He also found that Plaintiff had not engaged in

substantial gainful activity since September 30, 2008.  (*Id*.)  At step 2, the ALJ found that Plaintiff

had the following severe impairments:  degenerative disc disease of the cervical and lumbar spine;

migraine headaches; left corneal/retinal pathology, status-post corneal transplant with decreased left

vision.  (*Id*.)  At step 3, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (*Id*. at 24.)

The ALJ next determined that Plaintiff had the residual functional capacity to perform light

work, as defined in 20 C.F.R. § 404.1567(b), with the following limitations: lift and carry 20 pounds

occasionally and 10 pounds frequently; stand and walk about 6 hours in an 8-hour workday; sit

about 6 hours in an 8-hour workday; sit/stand at will to relieve pain or discomfort; push and pull 20

pounds with her upper extremities occasionally; never climb ladders, ropes or scaffolds; occasionally

climb ramps and stairs, kneel, crouch, and stoop; never balance or crawl; never reach overhead; and

frequently reach, handle, finger, and feel with her upper extremities; only look at a computer screen

for 30 minute periods; and never work around hazardous moving machinery or at unprotected heights. (*Id*.)

At step 4, the ALJ found that Plaintiff was capable of performing her past relevant work as an information clerk. (*Id*. at 29.) The ALJ also made an alternative finding under step 5. He found that Plaintiff was classified as a person closely approaching advanced age. (*Id*.) The ALJ further determined that she had at least a high school education, and was able to communicate in English. (*Id*.) He found that she had work skills from past relevant work that were transferable to other occupations with jobs that existed in significant numbers in the national economy. (*Id*.) He then found that there were other jobs that Plaintiff could perform which existed in significant numbers in the national economy, such as motel clerk, with 10,000 jobs in Texas and 100,000 in the national economy; automobile self-service attendant, with 4,000 jobs in Texas and 50,000 jobs in the national economy; and check cashier, with 4,000 jobs in Texas and 50,000 in the national economy. (*Id*. at 30.) Accordingly, he determined that Plaintiff was not disabled within the meaning of the Social Security Act between September 30, 2008, and the date of his decision. (*Id*. at 29.)

## II. ANALYSIS

A. *Legal Standards*

1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla,

but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination under a claim for disability benefits are identical to those governing the determination under a claim for supplemental security income. *See id*.  Thus, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*. at 436 and n. 1.

### 2.        Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

23

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential 5-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first 4 steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot

perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits. (Doc. 13-2 at 22.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B. *Issues for Review*

Plaintiff raises the following issues for review:

1.      Whether the ALJ failed to follow the treating physician rule;
2.      Whether the ALJ failed to properly evaluate Plaintiff's credibility;
3.      Whether the ALJ relied on flawed vocational expert testimony.

(Doc. at 13-2 at 5.)[2]

### C. *Treating Physician Rule*

The Plaintiff contends that the ALJ erred because he failed to give proper weight to the

---

[2] Citations refer to the cm/ecf system page number at the top of each page rather than the page numbers at the bottom of each filing.

opinions of her treating physician. (*Id*. at 12-15.) She further contends that the ALJ failed to weigh her treating physician's opinions under the factors enumerated in 20 C.F.R. § 404.1527(c)(1)-(6). (*Id*. at 15-16.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2) *Newton*, 209 F.3d at 455. If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.

*Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455-56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)."  *Id.* at 453 (emphasis in original).  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

In assessing Plaintiff's RFC, the ALJ "considered [the] opinion evidence in accordance" with the regulations.  (R. at 24.)  He relied on treating physicians' diagnoses and observations to find that Plaintiff was capable of performing light work, but he did not give controlling weight to the opinion of any particular treating physician.  (*Id.* at 26-28.)  Accordingly, pursuant to 20 C.F.R. §404.1527(e), he was required to discuss the weight he gave to Dr. Alfonso's November 2009 residual functional capacity assessment.  *See* 20 C.F.R. § 404.1527(c); *Alejandro v. Barnhart*, 291 F. Supp.2d 497, 515 (S.D. Tex. 2003).

In this case, the ALJ found Dr. Alfonso's opinion "inconsistent with the claimant['s] daily level of activity and the objective medical evidence as a whole."  (*Id.* at 28.)  He noted that Dr.

Alfonso released Plaintiff to return to work in November 2008 and January 2009, before opining in November 2009 and December 2010 that she was unable to work. (*Id*. at 26.)  He also noted that when she saw Dr. Girouard–an orthopedic specialist–in March 2009, she had full strength in all extremities with no atrophy.  (*Id*. at 28.)  Moreover, he noted that at the time of her consultative examination in May 2009, Plaintiff exhibited  only a mild decrease in range of motion in her knees, shoulders, and neck.  She could also forward flex to 70 degrees, walk without difficulty, and required no assistive device.  (*Id*.)  He also took note of the length of Plaintiff's treatment relationship with Dr. Alfonso.  (*Id*.)  Ultimately, he concluded that Dr. Alfonso's "restrictions regarding the claimant's ability to stand and walk are unreasonably limiting" and that "there are no physical examinations or objective testing in his treatment records to suggest the claimant has such limitations. He did, however, incorporate some of Dr. Alfonso's opinions into the RFC–he included additional limitations *not* recognized by the  SAMCs, e.g., perform only work which afforded her the ability to sit/stand at will; push or pull 20 pounds occasionally, never reach overhead, and only view computer screens for 30 minutes at a time. (*Id*. at 25.)  Because the ALJ explained his decision for giving little weight to Dr. Alfonso's RFC findings, as he was required to do by the regulations, he  committed no reversible error.  Accordingly, remand is not required on this issue.

In addition, Dr. Alfonso's December 2010 opinion that Plaintiff was "unable to work" due to numerous strength and postural limitations was not entitled to controlling weight.  (*Id*. at 571.) Section 404.1527(d) does not apply to opinions that a claimant cannot work or is disabled.  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (per curiam).  Moreover, a treating physician's opinions regarding a Plaintiff's disability are legal conclusions and have no special significance.  20 C.F.R. § 416.927(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

Because physicians generally define "disability" in a manner distinct from the Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue. *See Tamez v. Sullivan*, 888 F.2d 334, 336, n. 1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Act).

The ALJ's decision to give little weight to Dr. Alfonso's opinions was not erroneous and is supported by substantial evidence in the record. Remand is therefore not required on this issue.

## D.  *Credibility Determination*

Plaintiff contends that the ALJ erred in finding that Plaintiff's testimony about her pain and her resulting limitations was not credible. (Doc. 13-2 at 16-19.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991) (per curiam). The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n. 18 (5th Cir. 1994). In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id*. Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id*. If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements. *Id*.; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985) (per curiam)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects.  SSR 96-7p, 1996 WL 374186, at *2.  Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider.  *See* 20 C.F.R. § 404.1529(c) (2011).[3]  Nevertheless, the Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant."  *Falco*, 27 F.3d at 163.

Here, the ALJ acknowledged a link between Plaintiff's alleged symptoms and her medically determinable impairments, but he concluded from objective and other medical evidence that Plaintiff was not entirely credible.  He specifically found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with" the evidence of her residual functional capacity.  (R. at 26.)  The ALJ found that Plaintiff's impairments could be expected to produce some of her pain but not to the degree she claimed.  (*Id*. at 24-28.)  His decision reflects that he reviewed the evidence before applying several of the credibility factors listed in SSR 96-7p to Plaintiff's case.  (*Id*.)  He considered Plaintiff's course of treatment, hearing testimony and the medical evidence

---

[3]   These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

before determining that Plaintiff's subjective complaints were not completely credible.  (*Id*. at 24-28.)  The ALJ considered Plaintiff's daily activities–her ability to drive, help with household chores, cook, and shop. (*Id*. at 25-26; 28.)  He reviewed treatment records from Drs. Alfonso and Girouard documenting Plaintiff's complaints of neck, shoulder, and low back pain and headache between April 2007 and January 2010.  (*Id*. at 26-27.)  He noted that Dr. Alfonso treated Plaintiff's complaints of pain with only medication and physical therapy.  (*Id*. at 309, 314-314, 346, 348, 352, 356.)  He also took into account that Plaintiff chose not to have surgery despite Dr. Girouard's recommendation that she undergo cervical fusion.  (*Id*. at 55-56, 469.)  The ALJ also relied on the consultative examination and residual functional capacity assessment of SAMCs.  (*Id*. at 26, 28.) He noted the absence of objective factors indicating the existence of severe pain, e.g., no evidence of surgical lesion or nerve root compression, muscle atrophy or grossly abnormal neurological deficits.  (*Id*. at 28.)  The absence of such findings justifies the conclusions of the ALJ.  *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

The ALJ's discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible.  Although not in a formalistic fashion, he also considered the factors for determining credibility, and relied on substantial evidence to support his determination.  Remand is not required on this issue.

**E.**     ***Flawed VE Testimony***

Plaintiff contends that in evaluating Plaintiff's residual functional capacity, the ALJ relied on flawed VE testimony in response to an improper hypothetical question that did not include all of the limitations caused by her medically determinable impairments.  (Doc. 13-2 at 19-20.) Specifically, she contends that the ALJ should have limited her to standing and sitting for 1 hour in

an 8 hour work-day, and that his RFC should have incorporated her inability to tolerate even a low stress environment–as opined by Dr. Alfonso.[4]   (*Id*. at 20.)   She also contends that the VE's testimony conflicted with the DOT because the DOT does not provide for a sit/stand option.   (*Id*. at 20-21.)

      1.    ***Improper Hypothetical***

     To establish that work exists for a claimant at steps four and five of the sequential evaluation process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question.   *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam).   A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question.   *Id*. at 436.   A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability."   *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).   If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment.   *Id*. at 708.

     Here, the ALJ presented a hypothetical question to the VE asking whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work as actually performed or customarily performed in the national economy if she could sit, stand, and /or walk for six hours in an eight hour workday with the option of sitting or standing at will to

---

    [4]  Plaintiff's brief also references a preclusion for overhead reaching; however, the ALJ's RFC expressly incorporated that limitation.   (Doc. 13-2 at 20.)

relieve discomfort.  (R. at 59.)  His question also limited the hypothetical person to lifting and carrying 20 pounds occasionally, and 10 pounds frequently, and only occasionally pushing or pulling 20 pounds.  (*Id.*)  He included limitations for never climbing ladders, ropes and scaffolds, balancing, crawling  and reaching overhead; and only occasionally climbing ramps and stairs, and kneeling, crouching, and stooping; and frequently reaching handling, fingering, and feeling bilaterally.  (*Id.*)  Finally, his question incorporated a visual limitation of only looking at a computer screen at 30 minute intervals, and environmental limitations concerning hazardous moving machinery and unprotected space.  (*Id.*)  The VE opined that the hypothetical person could perform Plaintiff's past relevant work as an information clerk as described in the DOT.  (*Id.* at 60.)  The ALJ also asked the VE to opine whether there were jobs which existed in the national economy that a hypothetical person with the same limitations, and who had transferable skills, could  perform.  (*Id.* at 60.)  The VE explained that Plaintiff's sales and customer service skills were transferable, and he identified jobs as a motel clerk (light, SVP 4) with 100,000 jobs in the national economy and 10,000 in Texas; auto self-service attendant (light, SVP 3) with 50,000 jobs in the national economy and 4,000 in Texas; and check cashier (sedentary, SVP 3) with 50,000 jobs in the national economy and 4,000 in Texas.  (*Id.* at 61.)

In his RFC, the ALJ recognized the following limitations:  lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; sit/stand at will to relieve pain or discomfort; push and pull 20 pounds with her upper extremities occasionally; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, kneel, crouch, and stoop; never balance or crawl; never reach overhead; and frequently reach, handle, finger, and feel with her upper extremities; only look at a computer screen

for 30 minute periods; and never work around hazardous moving machinery or at unprotected heights. (*Id.* at 24.)  Therefore, the ALJ's hypothetical questions properly incorporated all of Plaintiff's limitations supported by the record and recognized by the ALJ.  *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002) (upholding ALJ's hypothetical question when it scrupulously incorporated all of the claimant's disabilities supported by evidence and recognized by the ALJ).  Substantial evidence therefore supports the ALJ's step 4 finding that Plaintiff could perform her past relevant work as an information clerk as described in the DOT, and his alternative step 5 finding that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform despite her limitations.

An ALJ is not bound by VE testimony that is based upon evidentiary assumptions that he ultimately rejects.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  The ALJ thus properly rejected the VE's testimony that an individual with the additional limitations listed by Plaintiff's counsel would not be able to perform any work activity.  The ALJ explicitly rejected the 1 hour sit/stand limitations proposed by Dr. Alfonso in arriving at Plaintiff's RFC, and his finding on that point was supported by substantial evidence, as previous found in section II. C. *supra*.  The ALJ also implicitly rejected Dr. Alfonso's opinion regarding Plaintiff's alleged inability to tolerate "even 'low stress'" when he found his opinion inconsistent with the claimant's daily level of activity and objective medical evidence as a whole."  (*Id.* at 28.)  Plaintiff points to no evidence that would support such a finding.  Aside from Dr. Alfonso's unsupported opinion, there is no information in the record to indicate that Plaintiff had any mental limitations.  *See Baker v. Colvin*, No. 3:11-CV-3497-M-BH, 2013 WL 1103265, at *20 (N.D. Tex. Mar. 18, 2013) ("The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a

physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.")  Accordingly, no error occurred and remand is not required on this issue.

2.     ***Conflict with DOT***

Social Security Ruling 00-4p requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by the VE and information in the DOT or its companion publication, the Selected Characteristics of Occupations (SCO) defined in the Revised DOT.  SSR 00-4p, 2000 WL 1898704, at *1-2 (S.S.A. Dec. 4, 2000).  As part of his duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency.  *Id*. at *4. The ALJ must also explain in the decision how any identified conflict was resolved.  *Id*.  Neither the DOT nor the VE evidence automatically trumps when there is a conflict.  *Id*. at *2; *Siller v. Barnhart*, No. SA-04-CA-0514 FBNN, 2005 WL 1430361, at *7-8 (W.D. Tex. June 17, 2005) (finding that neither the DOT nor VE testimony should automatically be accorded controlling weight).  Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT, however.  SSR 00-4p, 2000 WL 1898704, at *2.  When there is an "apparent unresolved conflict" between the DOT and VE testimony, the ALJ must elicit a reasonable explanation for the discrepancy.  *Id*.  Since the burden is on the ALJ to fully develop the record prior to determining disability, the claimant is not required to raise the issue of any discrepancy at the hearing.  *Romine v. Barnhart*, 454 F. Supp.2d 623, 627-28 (E.D. Tex. 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006)).  The responsibility lies with the ALJ to ask about any possible conflict between the VE's testimony

and the DOT.

In this case, the ALJ did not ask the VE at the administrative hearing whether her testimony conflicted with information in the DOC or SCO.  (*Id*. at 56-63.)  In his written decision, however, the ALJ concluded that "the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*."  (*Id*. at 30.)  There is no provision in SSR 00-4p for the ALJ to determine on his own if there is a discrepancy between the VE's testimony and the DOT; the ALJ must elicit the information from the VE on the record.  SSR 00-4p, 2000 WL 1898704, at *2.  The ALJ therefore erred when he failed to inquire on the record if the VE's testimony conflicted with the DOT.

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  A violation of a ruling may "constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation." *Pearson v. Barnhart*, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).  Remand for failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice.  *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (per curiam).

Plaintiff did not present any argument for how she was prejudiced by the ALJ's failure to reconcile the VE's testimony with the DOT.  (Doc. 13-2 at 16-17.)  Also, the ALJ's step 5 determination was an *alternative* ruling–he found Plaintiff not disabled at step 4.  (R. at 29-30.)  Although Plaintiff provided an example of an apparent unresolved conflict between the VE's testimony regarding light work and the information in the DOT, review of the VE's testimony

36

indicates that he took the sit/stand requirement into account in reducing the number of available jobs which existed in the national economy. (*Id*. at 61.)  Plaintiff essentially argues that the ALJ's failure to inquire about a conflict means that he cannot rely on the VE's testimony and that the decision is procedurally defective.  Since Plaintiff failed to demonstrate prejudice from the ALJ's failure to follow SSR 00-4p, however, remand is not warranted.  *Hall*, 660 F.2d at 119.

### III.  CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED**, this 29th day of March, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE